IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CURTIS DEWAYNE DECKER, *Appellant.*

No. 1 CA-CR 14-0238
FILED 1-7-2016

Appeal from the Superior Court in Maricopa County
No. CR2012-135551-001
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Kerri L. Chamberlin
*Counsel for Appellant*

---

**OPINION**

---

Judge Kent E. Cattani delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge John C. Gemmill joined.

---

**C A T T A N I**, Judge:

¶1        In this case we address whether firing a bullet into a residence constitutes "entry" for purposes of establishing first-degree burglary. Given Arizona's expansive statutory definition of entry, and in light of the property, possessory, and privacy interests that the offense of burglary is intended to protect, we conclude that a projectile intruding into a protected space satisfies the entry requirement for burglary. We further address and reject a claim regarding the superior court's denial of *Batson*[1] challenges to the State's peremptory strikes of two potential jurors. Accordingly, and for reasons that follow, we affirm Curtis Dewayne Decker's convictions of first-degree murder and burglary.

## FACTS AND PROCEDURAL BACKGROUND

¶2        The victim lived with his girlfriend and her mother, Judy, in Judy's apartment. Decker was friends with Judy and visited her regularly. One day, Decker and the victim fought in Judy's apartment. After pushing each other and wrestling, the victim drew a knife and cut Decker's face. Decker told the victim to step outside to "finish this," but the victim stayed inside and Decker rode away on a bicycle.

¶3        About 20 minutes later, Decker returned with two or three people in a car. They all got out of the car, and Decker walked to Judy's front door. The apartment manager—looking on from her own apartment—saw Judy standing beside the open door as Decker stood in the doorway, drew a gun, and quickly fired three shots. Decker then laughed, put the gun in his pocket, and left in the car. The victim, who was inside Judy's apartment, died from two close-range gunshot wounds to the chest. Judy later told the victim's daughter that she had seen Decker "in the doorway" and that Decker had shot the victim.

---

[1]        *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶4          After the apartment manager identified Decker from a photographic lineup, Decker was arrested and charged with first-degree murder and first-degree burglary.  After an initial mistrial due to a hung jury, Decker was convicted as charged, with the jury unanimously finding both premeditated and felony murder.  Decker was sentenced to concurrent terms of life in prison with the possibility of release after 25 years for the murder conviction and 10.5 years for the burglary conviction, and he timely appealed.  We have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 13-4033.[2]

## DISCUSSION

### I.     *Batson* Challenges.

¶5          Decker argues that the superior court erred by denying his *Batson* challenges to the State's peremptory strikes of prospective Juror 1 and Juror 76.  We review the superior court's denial of a *Batson* challenge for clear error, deferring to the court's first-hand assessment of the prosecutor's credibility.  *See State v. Garcia*, 224 Ariz. 1, 10, ¶ 22 (2010).

¶6          The Equal Protection Clause of the Fourteenth Amendment prohibits use of a peremptory strike to exclude a potential juror on the basis of race.  *Batson*, 476 U.S. at 89.  *Batson* challenges are assessed in three stages: "(1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination."  *State v. Cañez*, 202 Ariz. 133, 146, ¶ 22 (2002).  The opponent of the strike bears the burden of showing racial motivation.  *Garcia*, 224 Ariz. at 10, ¶ 21.

¶7          Decker's counsel first objected to the prosecutor's peremptory strike of Juror 76, who was one of three African American potential jurors, noting that Decker is also African American, and arguing that Juror 76's limited comments during voir dire did not indicate an inability to be fair and impartial.  In response, the prosecutor offered two reasons for the strike: (1) he knew comparatively less about Juror 76 than others in the venire because Juror 76 had answered only the standard biographical questions asked of each potential juror but had not otherwise

---

[2]          Absent material revisions after the relevant date, we cite a statute's current version.

spoken during voir dire and (2) Juror 76 had failed to follow the court's instruction to remain outside the courtroom during a break. The judge noted that she had observed Juror 76 entering the courtroom unaccompanied while the lawyers were speaking about the case, despite having been instructed that jurors should not enter the courtroom unless escorted by the bailiff. The court found this to be a race-neutral reason for the strike, and thus denied Decker's challenge.

¶8        Decker next objected to the State's subsequent strike of Juror 1, an African American woman, alleging a pattern of discrimination based on the State's strikes of two of the three African American potential jurors. The prosecutor again offered two reasons for the strike: (1) he knew very little about Juror 1 because she also had only answered the standard biographical questions at the end of voir dire and (2) Juror 1 appeared to have dozed off at times, and her demeanor—arms crossed, hand in pocket—made her seem uninterested in the proceedings. The prosecutor noted that he had also struck Juror 47, who was not African American, for lack of information because he had only answered the biographical questions at the end of voir dire. Although the judge did not observe Juror 1's demeanor because she was not in the judge's line of sight, the court found lack of information and uninterested demeanor to be race-neutral reasons for the strike, and thus denied Decker's *Batson* challenge. The court later noted that one African American (Juror 56) was selected to serve on the jury.

¶9        Relying on *Miller-El v. Dretke*, 545 U.S. 231 (2005), Decker argues that the prosecutor's "lack-of-information" explanation for the strikes was pretextual because the prosecutor could have questioned Jurors 1 and 76 to elicit additional information, but chose not to do so. In *Miller-El*, the prosecutor, apparently as an afterthought, offered the prior conviction of a potential juror's brother as a reason for striking the juror. *Id.* at 246. The failure to ask additional questions after the prospective juror stated "I don't really know too much about it"—along with other indicators of pretext—belied the importance the prosecutor later attributed to the family history. *Id.* Here, in contrast, there was no discrete issue about which the State had expressed a concern and which might have warranted follow-up questioning.

¶10        Although "lack of information" is generally an unpersuasive rationale for striking a prospective juror, Decker did not show that the strikes represented purposeful racial discrimination. *See Cañez*, 202 Ariz. at 146, ¶ 22. The prosecutor apparently struck a non-African American juror for the same lack-of-information reason, and the fact that an African

American was impaneled, although not dispositive by itself, also suggests that the two challenged strikes did not establish a pattern of racial discrimination. *See State v. Roque*, 213 Ariz. 193, 204, ¶ 15 (2006).

**¶11**　　　More importantly, the prosecutor offered an additional relevant and facially race-neutral reason for each strike. The judge confirmed the prosecutor's observation of Juror 76 failing to follow the court's instructions and implicitly found credible the prosecutor's account of Juror 1's dozing and inattentiveness, and we defer to the superior court's first-hand observations and credibility determinations. *See State v. Newell*, 212 Ariz. 389, 401, ¶ 54 (2006). Under the circumstances, and particularly in light of the additional reason offered for each strike, the superior court did not err by denying Decker's *Batson* challenges.

## II.　Projectile Theory of Entry for Purposes of Burglary.

**¶12**　　　Decker next argues that the evidence was insufficient to establish entry into the apartment as necessary to support his burglary conviction.

**¶13**　　　In closing argument, the prosecutor argued that a projectile fired into a residence — in this case, the bullets fired from the gun Decker used to shoot the victim — could establish the element of entry necessary to prove he committed burglary. Decker objected, arguing the prosecutor had misstated the law, but the court overruled Decker's objection. Although the prosecutor posited in the alternative that Decker had physically entered the apartment, both the prosecutor's and defense counsel's arguments regarding this element of the offense focused predominantly on the projectile theory of entry.

**¶14**　　　We generally review the superior court's rulings controlling closing argument for an abuse of discretion. *State v. Lynch*, 238 Ariz. 84, 97, ¶ 33 (2015). We consider de novo, however, the court's construction of a statute, looking first to the provision's plain language and considering the common meaning of any undefined terms. *State ex rel. Montgomery v. Harris (Shilgevorkyan)*, 237 Ariz. 98, 100, ¶ 8 (2014); *State v. Pena*, 235 Ariz. 277, 279, ¶ 6 (2014); *see also* A.R.S. § 1-213 (stating that statutes should be construed based on the common meaning of words and phrases, unless subject to an established legal definition). We may consult dictionaries to determine the ordinary meaning of statutory terms. *Pena*, 235 Ariz. at 279, ¶ 6; *State v. Gill*, 235 Ariz. 418, 420 n.1, ¶ 8 (App. 2014).

**¶15**　　　As relevant here, an individual commits first-degree burglary by "entering or remaining unlawfully in or on a residential

structure with the intent to commit any theft or any felony therein" while knowingly possessing a deadly weapon. A.R.S. §§ 13-1508(A), -1507(A). The only element at issue here is the requirement of entry.

¶16 A.R.S. § 13-1501(3) defines "entry" as "the intrusion of any part of any instrument or any part of a person's body inside the external boundaries of a structure or unit of real property." Thus, by its terms, the statute allows entry by an instrument alone, even if no part of the perpetrator's body crosses the threshold. *Id.*; *see also State v. Kindred*, 232 Ariz. 611, 614, ¶ 9 (App. 2013) (concluding that insertion of a pry bar into a door jamb constituted entry).

¶17 Although the statute does not define "instrument," the term is generally understood to mean "[a] tool or implement used to do or facilitate work." *American Heritage Dictionary* 910 (5th ed. 2011); *see also Instrument Definition,* Oxford English Dictionary Online ("OED") (Oxford Univ. Press 2015) (defining an instrument as "a thing with or through which something is done or effected; . . . a means" or as "[a] material thing designed or used for the accomplishment of some mechanical or other physical effect; a mechanical contrivance (usually one that is portable, of simple construction, and wielded or operated by the hand); a tool, implement, weapon").

¶18 This common understanding is consistent with the statutory definition of a "dangerous instrument" (found in another section of the criminal code) as "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." A.R.S. § 13-105(12). When considered without the "dangerous" limitation ("readily capable of causing death or serious physical injury"), that definition in effect acknowledges that an instrument is anything used for a purpose. *See id.*

¶19 The question thus becomes whether a projectile bullet can be characterized as a tool or implement used to do work that intrudes into the residence. Because a person firing a bullet, even if from outside a doorway, is using the projectile as a means to accomplish a task within the residence—here, murder—the bullet qualifies as an instrument that can "enter" a structure for purposes of burglary.

¶20 Decker acknowledges that the gun he was holding would be an instrument for these purposes, but he argues that the projectile bullet is not an instrument. First, Decker posits that the bullet on its own is not a tool; rather, the gun is a tool and the bullet just another object used in

carrying out the gun's purpose. But the use of a bullet is not substantively different than, for instance, a knife thrown from outside the doorway. That the perpetrator uses another instrument to accelerate the bullet does not change the fact that the bullet itself is an instrument that causes damage across the threshold. *See OED* (defining an instrument as "a thing with or through which something is done or effected; . . . a means").

¶21 Decker also suggests that an instrument for these purposes must be handheld so as to approximate personal entry by the perpetrator. But the current statutory definition does not restrict entry-by-instrument to only objects held by or physically connected to the perpetrator. A.R.S. § 13-1501(3) ("any part of any instrument *or* any part of a person's body") (emphasis added). Moreover, Arizona's burglary statutes previously restricted entry-by-instrument to only "an instrument or weapon held in [the] hand," A.R.S. § 13-301(1) (1956); the Legislature removed this "handheld" requirement when enacting the 1978 Criminal Code. *See* A.R.S. § 13-1501(2) (1978). This legislative change supports the conclusion that entry-by-instrument under the current statutory definition encompasses entry by a projectile.

¶22 Holding that intrusion by a projectile may constitute entry (when accompanied by the requisite felonious intent) is also consistent with the purposes underlying criminalizing burglary. At their core, burglary statutes are intended to "protect the security of the home, and the person within his home." *Kindred*, 232 Ariz. at 614, ¶ 8 (citation omitted); *see also* Arizona Criminal Code Commission, Arizona Revised Criminal Code 159 (1975) ("The essence of the offense of burglary is the unauthorized invasion of protected premises."). The offense recognizes the "heightened expectation of privacy and possessory rights of individuals in structures and conveyances" and penalizes violation of the victim's property, possessory, and privacy rights within his or her home. *State v. Hinden*, 224 Ariz. 508, 511, ¶ 13 (App. 2010) (quoting 12A C.J.S. Burglary § 1, at 53 (2004)); *see also Gill*, 235 Ariz. at 421, ¶ 13; Minturn T. Wright, III, Note, *Statutory Burglary — The Magic of Four Walls and A Roof*, 100 U. Pa. L. Rev. 411, 427 (1951) (characterizing common law burglary as an "offense against the habitation").

¶23 The victim's interest in protecting his or her space does not vary depending on how the perpetrator invades that space. The intrusion of a bullet fired from just outside the open doorway no less disrupts the victim's security in his or her home than one fired after the muzzle of the gun crosses the threshold.

¶24      Finally, we note that, even in jurisdictions that have not defined "entry" by statute, courts have similarly recognized, based on burglary's common law underpinnings, that projectile instruments can accomplish an entry if used "to consummate a criminal objective."[3] *See Commonwealth v. Cotto*, 752 N.E.2d 768, 771 (Mass. App. Ct. 2001) (holding that a bottle containing gasoline thrown through a window and used to start a fire inside an apartment constituted entry); *State v. Williams*, 873 P.2d 471, 474 (Or. Ct. App. 1994) (holding that bullets fired into a house, intended to intimidate a witness, constituted entry); *cf. Ex parte Hyde*, 778 So. 2d 237, 239 n.2 (Ala. 2000) (rejecting entry by bullet based on a state law requiring "entry by some part of the defendant's body"). Our interpretation of "entry" is thus also consistent with the "conceptual broadening of [common law] burglary" as reflected in our burglary statutes. *See Gill*, 235 Ariz. at 421, ¶ 13.

¶25      Accordingly, we conclude that bullets fired into a structure, assuming all other elements of the offense are met, constitutes entry sufficient to support a burglary conviction. The prosecutor's argument to that effect thus correctly stated Arizona law, the superior court did not err by denying Decker's objection, and sufficient evidence supported Decker's burglary conviction.

---

[3]      Traditional common law treatises reflect no consensus view on entry-by-projectile. *Compare* 2 Edward Hyde East, *A Treatise of the Pleas of the Crown* § 7, at 490 (1803) (recognizing disagreement among authorities regarding whether a projectile bullet could constitute entry, but concluding there is no substantive distinction between an instrument "holden in the hand" and one "discharged from it"), 1 William Hawkins, *A Treatise of the Pleas of the Crown*, ch. 17, § 11 (8th ed., 1824) (positing entry by "discharge [of] a loaded gun into a house"), *with* 4 William Blackstone, Commentaries *227 (recognizing entry by "an instrument held in the hand"), 1 Matthew Hale, *The History of the Pleas of the Crown*, 554–55 (1st Am. ed. 1847) ("But if he shoots without the window, and the bullet comes in, this seems to be no entry to make burglary; *quaere*.").

More modern treatises that address the issue, however, generally recognize entry-by-projectile. *See* 3 Wharton's Criminal Law § 333 (14th ed. 1980 & supp. 1994) (recognizing "entry" "when the defendant, while standing outside, fires a bullet which pierces a window and lands inside, the gun having been discharged for the purpose of killing the occupant"), Nolan & Henry, Criminal Law § 403 (2d ed. 1988) ("If [a bullet is] fired to kill a person inside, probably an entering could be found.").

## CONCLUSION

¶26      For the foregoing reasons, we affirm Decker's convictions and sentences.



**Ruth A. Willingham** · **Clerk of the Court**
FILED: ama